IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

CRYSTAL GAIL MANGUM, )
)
    Plaintiff Pro Se, )
)
v. ) Case No.: 5:21-cv-00337-D
)
OXYGEN MEDIA, LLC, )
    and )
JENNIFER GEISSER, )
Oxygen Media Executive Vice President, )
)
    Defendants. )
_____ )

JURY TRIAL DEMANDED

**COMPLAINT – LIBEL AND DEFAMATION**

**I. INTRODUCTION**

1.     This is an action by Plaintiff Pro Se against Defendants seeking equitable relief and redress for libel and defamation, as defined in 28 U.S.C. § 4101 (1). All three elements for defamation are met as follows: (1) form of speech is false – Defendants claimed in written article title that Plaintiff Pro Se "fatally stabbed" her boyfriend when facts support an accidental manner of death by a third party thereby obviating Plaintiff Pro Se from any liability in a deadly outcome *(Exhibit A)*; (2) damage reputation or cause emotional distress – Plaintiff Pro Se being falsely labeled as a murderess by Defendants represents *libel per se*; and (3) presented (to a third party) a person in a false light – Defendants published untruthful and derogatory statements about Plaintiff Pro Se online for worldwide consumption.

2.     On May 14, 2020 via USPS certified correspondence, Plaintiff Pro Se presented Defendants with proof supporting her assertion that her boyfriend was not fatally stabbed, and

she sought an amended title removing the word "fatally" and a correction to the article explaining that the manner of death was an accident and not homicide. This letter was ignored. ***(Exhibit B)***

3. On April 26, 2021, Plaintiff Pro Se mailed a second letter to Defendants, again requesting relief to make the article more accurate and mitigate its defamation. Defendants refused Plaintiff Pro Se's letter and sent it back unopened by "Return to Sender" where it was picked up on May 17, 2021 by Plaintiff Pro Se advocate Sidney B. Harr, M.D. ***(Exhibit C)***

4. Unwillingness of Defendants to remedy the malicious inaccuracy forced Plaintiff Pro Se to pursue legal redress in This Court based on diversity jurisdiction.

## II. JURISDICTION

5. Jurisdiction of This Court in this case is established under 28 U.S.C. § 1332 – diversity jurisdiction because both parties are citizens of different states; Plaintiff Pro Se is a resident of North Carolina and Defendants reside in the state of New York.

## III. PARTIES

6. **Plaintiff Pro Se Crystal Gail Mangum** (hereinafter "MANGUM") is currently confined at Anson Correctional Institution, 552 Prison Camp Road, Polkton, NC 28135. MANGUM is an African American female, single mother of three who was born, raised, and resided in Durham, NC at the time of her April 3, 2011 arrest that initiated a sequence of events leading to this legal action. MANGUM's advocate and fiancé Sidney B. Harr, M.D. (hereinafter "HARR") is a resident of Raleigh, in North Carolina's Eastern District.

7. **Defendant Oxygen Media, LLC** (hereinafter "OXYGEN") is a media corporation whose media content includes the online/television series *Snapped* and has a

business address of 30 Rockefeller Plaza, New York, NY 10112.

8. **Defendant Jennifer Geisser** (hereinafter "GEISSER") is an executive vice president of Communications with OXYGEN with the same business address as OXYGEN.

9. Both OXYGEN and GEISSER combined are referenced hereinafter as "DEFENDANTS."

## IV. STATEMENT OF THE FACTS

10. On the evening of March 13, 2006, MANGUM, a single African American North Carolina Central University coed and mother – hired to perform exotic dancing (stripping) at a beer-guzzling/stripper-ogling Spring Break bash hosted by the Duke lacrosse team at a Durham, NC bungalow – claimed she was sexually assaulted by three of approximately fifty white partygoers in attendance.

11. Durham District Attorney Mike Nifong (hereinafter "NIFONG"), against advice of colleagues, pursued the prosecution of three suspects identified with high degree of certainty from a photo line-up by MANGUM. NIFONG was forced to relinquish his investigation by the NC State Bar which had initiated its own grievance against him; NIFONG transferring the criminal investigation to the NC Attorney General's Office ("NC AGO") in January 2007.

12. A cursory investigation by NC AGO followed which included a late March 2007 six-hour interview with MANGUM that was not recorded by audio/video/scribe (i.e., no record or recording of the MANGUM interview existed).

13. On April 11, 2007, then-Attorney General Roy Cooper (hereinafter "COOPER"), made a public promulgation in which he dropped all criminal charges connected with the case and, in accordance with an agreement made between defense attorneys and his assistant attorneys general, unprecedentedly declared the three Duke student/athletes to be "innocent"...

thereby paving the way for an out-of-court settlement between the Duke defendants and Duke University in which each Duke defendant received twenty-million dollars ($20,000,000.00).

14. MANGUM's allegations were not believed with many media relying on statements made by COOPER to report as fact that MANGUM lied about being sexually assaulted at the Duke party.

15. Sentiment towards MANGUM turned hostile with some demanding COOPER prosecute accuser MANGUM for filing a false police report... which he refused to do, and as WRAL-5 News reporter Amanda Lamb noted in DEFENDANTS' October 7, 2018 article, "After 2006, she was pretty much a pariah, or a persona non grata, in this community."

16. Years later in the wee hours of Sunday, April 3, 2011, MANGUM was confronted by her jealousy-enraged, intoxicated alcoholic black boyfriend Reginald Daye (hereinafter "DAYE") for what he perceived to be her flirting with another male and thus disrespecting him; his verbal disparagement progressing quickly to physical life-threatening abuse – specifically, he was straddled atop and choking her when she poked him once in the left side with a steak knife. Her immediate and reflexive action both spared her life and helped affect her escape.

17. Within hours of his wounding, DAYE underwent successful emergency surgery at Duke University Hospital, with a postoperative prognosis for a complete recovery.

18. The evening of Wednesday, April 6, 2011, his third post-op hospitalization day, DAYE's alcoholic withdrawal deteriorated to delirium tremens, prompting his transfer to Duke's Surgical Intensive Care Unit. In treating his DTs, hospital staff errantly placed an intubation tube in DAYE's esophagus instead of trachea which led to his brain-death and comatose state.

19. On Wednesday, April 13, 2011, following a week of observation without neurological improvement, DAYE was electively removed from life-support and he died.

20. The following day, Thursday, April 14, 2011, then-NC Deputy Chief Medical Examiner Dr. Clay Nichols (hereinafter "NICHOLS"), conducted an autopsy on DAYE and produced an autopsy report without mention of: (1) the errant intubation; (2) subsequent cardiac arrest; (3) re-intubation; (4) placement on life-support; and (5) elective removal off life-support.

21. Four days later, on Monday, April 18, 2011, Durham grand jury handed up a murder indictment against MANGUM in DAYE's death based on NICHOLS' autopsy report which asserted the manner of death to be a "homicide" (required for a murder prosecution).

22. In March 2012, HARR surreptitiously gained access to prosecution discovery which included DAYE's hospital records, and being a retired physician it was evident to him that the manner of death was an accident by Duke medical staff.

23. On November 12, 2013, MANGUM's murder trial began with her defense attorney Daniel Meier presenting a "self-defense" defense instead of one based primarily on an "accidental manner of death" defense which was favored by MANGUM... in other words, she wanted to argue that the crime of murder was not even committed.

24. At trial MANGUM's defense did not challenge the manner of death and instead relied on a self-defense argument; the trial lasting ten days with a six-hour deliberation yielding a verdict to convict.

25. With MANGUM's November 22, 2013 second-degree murder conviction in DAYE's death, she was sentenced to a minimum of fourteen years imprisonment by presiding Judge Paul Ridgeway (hereinafter "RIDGEWAY").

26. A Direct Appeal, by an appointed appellate defense attorney, featured a single weak issue that was destined to fail... and which had nothing to do with the manner of death. The Direct Appeal was denied by the North Carolina Court of Appeals in 2015.

27.     In an attempt to get relief for MANGUM, HARR sent a February 11, 2015 e-mail to all NC legislators titled "Crystal Mangum convicted for non-existent crime," in which he emphasized the accidental manner of DAYE's death. The e-mail received no reply. *(Exhibit D)*

28.     On October 7, 2018, OXYGEN published on its "Murders A-Z" online site an article written by Sowmya Krishnamurthy titled, "Former Exotic Dancer Who Accused Duke Lacrosse Players of Sexual Assault Fatally Stabs Boyfriend." *See (Exhibit A)*

29.     Objectionable in the article's title was the adverb "fatally" which was not only inaccurate but defamatory towards MANGUM, however HARR realized the futility in any of his potential efforts to effect change with OXYGEN because, though he was a retired physician, he lacked standing and reputation in the forensic pathology field.

30.     Belatedly realizing the importance of the messenger to the message, in July 2019, HARR went to Pittsburgh, PA and retained the services of arguably the world's foremost expert forensic pathologist and medicolegal consultant Dr. Cyril H. Wecht (hereinafter "DR. WECHT") to review MANGUM's murder case with a focus on NICHOLS' April 14, 2011 autopsy report.

31.     Three months later, on October 25, 2019, DR. WECHT issued his eight-page report which contained two important determinants: (1) the manner of death of DAYE was an ***accident*** due to hospital error and ***not*** a homicide secondary to complications of a stab wound inflicted by MANGUM; and (2) the opinions of NICHOLS regarding the cause/manner of death of DAYE were unreliable due to significant discrepancies between the NICHOLS' autopsy report and the hospital/medical records. *(Exhibit E)*

32.     On May 14, 2020, at MANGUM's behest and armed with DR. WECHT's report, HARR wrote OXYGEN's Vice-president of Communications Barry Rosenberg seeking corrections in its October 7, 2018 article. In support of his position that DAYE's death was not

- 6 -

Case 5:21-cv-00337-D   Document 1   Filed 08/23/21   Page 6 of 17

due to a stabbing, HARR enclosed not only DR. WECHT's report, but other documents/exhibits as well. No response followed. *See (Exhibit B)*

33. On July 9, 2020, HARR, at the behest of MANGUM, wrote a letter to the legal counsel of WRAL-5 News (part of media conglomerate Capitol Broadcasting Company) with a request to amend and place corrections in two of its online articles dated November 22, 2013 and December 30, 2014, and respectively titled "Mangum found guilty in boyfriend's stabbing death," and "Mangum appeals murder conviction in boyfriend's stabbing death." *(Exhibit F)*

34. MANGUM found objectionable in the WRAL-5 articles the words "stabbing death" which deflected blame for DAYE's death from Duke University Hospital staff's (where it truly belonged) onto her.

35. Three weeks later, on July 30, 2020, after receiving no response from WRAL-5 News counsel, HARR sent a second letter requesting corrective changes to the two articles and warning of legal action if no action was taken. *(Exhibit G)*

36. No response from WRAL-5 News legal counsel was forthcoming, therefore on January 6, 2021, MANGUM filed a libel and defamation complaint against WRAL-5 News, et al., in Wake County Superior Court's Civil Division (case no.: 21-cvs-000308).

37. While awaiting the civil process against WRAL-5 News to proceed in Wake County, HARR again notified OXYGEN's Vice President of Communications – GEISSER – in a letter dated April 26, 2021. This packet also contained a copy of DR. WECHT's report, it all being moot as the packet was refused un-opened by DEFENDANTS and returned-to-sender... delivered to its Raleigh point of origin on May 17, 2021. *See (Exhibit C)*

38. With DEFENDANTS' October 7, 2018 online article's title unchanged and thereby retaining its inaccurate and defamatory status as of the August 23. 2021 filing date of this complaint, MANGUM has initiated this legal action in Federal Court to seek relief.

## V. ANALYSIS AND ARGUMENTS

39. When nearly a dozen alleged female victims of sexual harassment at the hands of New York Governor Andrew Cuomo recently came forward, they were lauded for their courage with the state's attorney general pronouncing "We believe the women;" a far different reception given to MANGUM in 2006-2007... nearly a decade before emergence of the #MeToo Movement.

40. A black single mother and HBCU Durham coed, MANGUM's 2006 accusations of sexual assault were against three white Duke University student/athletes who hailed from families of wealth, influence, and privilege, and she suffered the consequences feared most by female victims of male perpetrators in relatively greater positions of power: (1) not being believed; and (2) retaliation.

41. Following COOPER's April 11, 2017 promulgation of the Duke defendants' innocence, the media uncharacteristically weighed in using his disparaging comments about MANGUM as a basis of fact in reporting MANGUM lied about being sexually assaulted at the 2006 party; MANGUM steadfastly asserting she told the truth about the attack.

42. With negative media input on the subject, the vast majority of the general public did not believe MANGUM... the opportunity for retaliation would present itself four years later in 2011 when she fought for her life against her boyfriend DAYE.

43. Hospital records cleared the nonfatal wound MANGUM inflicted from having any part in DAYE's death as his surgery was successful and he was on his way to a full recovery.

44. DAYE's hospital records demonstrate his cause of death had to do with an errant esophageal intubation to treat his DTs that precipitated his brain-death comatose state; DAYE dying a week later following his elective removal from life-support.

45. An e-mail to MANGUM's first defense attorney sent the day following DAYE's death, April 14, 2011, acknowledged that a problem with a tube, and not the stab wound, was responsible for his death.

46. The unidentified e-mail sender also mentioned that because DAYE's death was not due to the stab wound, Duke University was going to "keep it quiet." And what better way to keep the truths of DAYE's demise quiet than by silencing the media (similar to the media blackout during the week of DAYE's comatose condition). *(Exhibit H)*

47. On April 6, 2011, the week prior to DAYE's death, media collectively went silent on his medical status following his errant intubation-induced comatose state, with media coverage resuming only after his April 13, 2011 death; and then with media suppression of events leading up to and following DAYE's brain-death which enabled the false NICHOLS' narrative to have more veracity... i.e., complications from a stab wound causing his death.

48. NICHOLS' fraudulent autopsy report contained fabricated findings not supported in medical records, was in violation of standard protocol by failure to photographically document pertinent findings and non-findings, and contained a false and unsubstantiated conclusion DAYE "died secondary to complications of a stab wound to the chest" ... there being no mention of the esophageal intubation, the resultant cardiac arrest, 20 minutes of cardiopulmonary resuscitation, placement on life-support, and his removal from life-support after a week's observation.

- 9 -

Case 5:21-cv-00337-D   Document 1   Filed 08/23/21   Page 9 of 17

49. Though factually there was no nexus between the stab wound/its treatment and DAYE's brain-death/actual death, consumers of media believed the wound MANGUM inflicted and/or its treatment was directly or indirectly responsible for DAYE's death.

50. In obtaining a first-degree murder indictment against MANGUM on April 18, 2011, the State was seeking a life-sentence without the possibility of parole (not because of DAYE's 2011 death, but because she accused three white Duke lacrosse players of sexual assault in 2006). Clearly this vindictive prosecution was about retaliation, not justice.

51. Though HARR tried repeatedly to present the truths of DAYE's death to media outlets, they refused to accept them... definitely not reporting them to the general public which continued to believe DAYE died secondary to complications of MANGUM's stabbing.

52. For many years COOPER, NC Attorney General Josh Stein, Durham District Attorney Satana Deberry, Lieutenant Governor Dan Forest, Durham politicians (Senators Dan Blue, Valerie Foushee, Floyd McKissick/Representatives Vernetta Alston, Larry Hall, and others), Durham mayors and City Council, innocence projects (NC Innocence Inquiry Commission, NC Center on Actual Innocence, etc.), civil rights/social justice organizations (NAACP, ACLU, etc.), and others ignored HARR by refusing to meet or communicate with him to discuss MANGUM's case. Media silence regarding MANGUM was the main enabler allowing officials, politicians, organizations and others to avoid fear of exposure about refused confrontation by HARR with truths of her innocence in DAYE's death.

53. Gravity of media-silence about truths of DAYE's death on April 13, 2011 was surpassed in light-years by its silence regarding the DR. WECHT report of October 25, 2019 with its ramification that MANGUM had been prosecuted, convicted, and served nearly a decade (to date) of a minimum fourteen-year sentence for a crime she not only did not commit, but for a

- 10 -

Case 5:21-cv-00337-D   Document 1   Filed 08/23/21   Page 10 of 17

crime that was not committed. The media did not want the public to know about the worldwide respected and celebrated physician/attorney's report which essentially vindicated MANGUM... her innocence being absolute. (In a case in which no crime is committed, innocence is absolute.)

54. On October 31, 2019, after filing for MANGUM a Pro Se Motion for Alternative Relief based on the DR. WECHT report (which RIDGEWAY later denied), HARR began notifying all media (mainstream, TV news, daily newspapers, weekly news/entertainment tabloids, black newspapers, independent public online media, podcast/bloggers, etc.) about the report by DR. WECHT... with only one true-crime podcast eventually publishing about it.

55. On November 25, 2019, one month after DR. WECHT issued his report, CBS-17 News (CBS Raleigh affiliate) anchor Bill Young conducted a twenty-minute Skype interview with DR. WECHT in which the world-renowned forensic pathologist explained his report in depth; it being DR. WECHT's hope that the interview would be aired in its entirety.

56. However, within a matter of weeks it was evident the CBS-17 News broadcast of the Skype interview was in jeopardy, likely for the simple reason the CBS-17 News interviewer was unable to discredit DR. WECHT's arguments in support of his report exonerating MANGUM. Concerns about diminishing prospects for the Skype interview being broadcast were documented in a late November 2019/early December 2019 e-mail exchange between HARR and DR. WECHT. *(Exhibit I)* HARR waited, but received no communication from CBS-17 News about its intentions regarding the Skype interview with DR. WECHT.

57. In an April 3, 2020 e-mail response to HARR's vented frustrations about the media's refusal to cover MANGUM's case, DR. WECHT wrote: "I deeply regret the insensitive, rude, cowardly treatment you have received from the news media in response to your efforts to have them revisit this case." *(Exhibit J)*

58. WRAL-5 News and DEFENDANTS went a step further than most media – which merely suppressed truths of MANGUM's innocence and secreted DR. WECHT's report and its implications – by willfully and falsely attributing DAYE's death to stab wound complications... based on NICHOLS' autopsy report. And, both refused requests by MANGUM to amend their online articles to reflect the truth and provide corrections; their inactions resulting in legal action by MANGUM.

59. CBS-17 News' twenty-minute Skype interview with DR. WECHT, MANGUM believed, would be beneficial in support of her libel/defamation lawsuit against WRAL-5 News, so HARR made an attempt to retrieve a copy of it by writing CBS-17 General Manager John O. Lewis on August 4, 2021.

60. HARR made clear that he needed a copy of the interview to aid in MANGUM's civil lawsuit against WRAL-5 News, and an e-mail response days later confirmed HARR's worst fear that the interview with DR. WECHT (having never been aired or uploaded on its website) had been deleted. *(Exhibit K)* In essence, it was similar to destroying exculpatory evidence.

61. In an e-mail sent August 10, 2021, HARR notified DR. WECHT about CBS-17 News' deletion of his Skype interview with news anchor Bill Young, and DR. WECHT expressed his opinions about that development in an e-mail sent August 11, 2021: "I am very disappointed by the censorship of my input re this case by CBS and the other news media. I believe my comments were quite relevant and important. The bias by the news media re this case is horrible. I regret that I do not have a copy of my Skype interview." *(Exhibit L)*

62. Arguably the most revered and respected forensic pathology expert and medicolegal consultant, DR. WECHT's assessment of MANGUJM's case are extremely relevant and important and should be held in much higher esteem than the views of NICHOLS who was

- 12 -

Case 5:21-cv-00337-D   Document 1   Filed 08/23/21   Page 12 of 17

fired, considered for criminal investigation for his work in other cases *(Exhibit M)*, produced an inaccurate and flawed official document, and committed material perjury at MANGUM's trial.

63. Yet, DEFENDANTS and media disregarded DR. WECHT's prized opinions in MANGUM's case and relied on the faulty and biased conclusions of NICHOLS in order to support their desired narrative... even though it resulted in years of wrongful incarceration.

64. DEFENDANTS' October 7, 2018 online article title claiming MANGUM "fatally" stabbed her boyfriend, like WRAL-5 News' online headline declaring that MANGUM's boyfriend's death was a "stabbing" one, is not supported by the facts or DR. WECHT's report... and like WRAL-5 News, OXYGEN not only refused to make a correction, but ignored MANGUM's request to rectify the article's inaccuracy... exemplifying malice.

65. Established protocol and precedent allow the Secretary of NC Department of Health and Human Services to order the NC Office of the Chief Medical Examiner ("OCME") to reevaluate any questionable autopsy report, and on May 26, 2020, HARR wrote the NC DHHS Secretary Dr. Mandy Cohen (hereinafter "COHEN") to request such a review of NICHOLS' autopsy report on DAYE. *(Exhibit N)*

66. COHEN ignored HARR, and in a September 14, 2020 e-mail reply to Representative Mr. Shelly Willingham (who five days earlier requested an autopsy review at the behest of HARR) stated a review would be inappropriate and claimed a review had already been conducted in 2014 by former NC Chief Medical Examiner Dr. Deborah Radisch... COHEN's claim of a 2014 review being unlikely without the existence of a written report. *(Exhibit O)*

67. Withholding such a routine procedure by COHEN deprived MANGUM of due process typically enjoyed by non-pariah status individuals, and was clearly undertaken with assurances of an all-encompassing media-silence in all things related to MANGUM's case.

- 13 -

68. In addition to NICHOLS being fired and under consideration for criminal investigation for his work in other cases, the 18-page document from his personnel folder, which RIDGEWAY deemed relevant, was withheld from MANGUM's "non-attorney eyes," and kept under seal – thereby depriving MANGUM of supplemental exculpatory evidence to discredit the April 14, 2011 autopsy report and its author.

69. Misdeeds and malfeasances by government officials, courts, and media, itself, have been secreted from the people by a collectively silenced media... including DEFENDANTS.

70. Had the media, DEFENDANTS included, not suppressed the truths of DAYE's death and not censored the report of DR. WECHT, in all likelihood MANGUM would today be freed and exonerated for the crime that never happened.

71. DEFENDANTS' unwillingness to take corrective measures to accurately reflect the truths of MANGUM's case and their excessive act in laying blame on her for DAYE's death by averring he was fatally stabbed precipitated this legal action.

## VI. CONCLUSIONS

72. Per DEFENDANTS' own article, MANGUM was shunned following COOPER's 2007 declaration of innocence for the Duke Lacrosse defendants; specifically stated by WRAL-5 TV journalist Amanda Lamb, "After 2006, she was pretty much a pariah, or a persona non grata, in this community." *See (Exhibit A)*

73. Demonized by the media, retaliation against her as payback for her sexual assault allegations against Duke defendants readily allowed the trumped-up murder case to end in a second-degree murder conviction reliant on a knowingly spurious autopsy report by NICHOLS.

74. DEFENDANTS, along with other media-types kept truths of DAYE's demise from the general public and supported the false narrative based on NICHOLS' autopsy report

- 14 -

that his death resulted from complications of a stab wound inflicted by MANGUM, when they had full knowledge of the report by DR. WECHT, world-renowned forensic pathology expert and medicolegal consultant which determined that the manner of death was an accident thereby conferring absolute innocence on MANGUM in DAYE's death.

75. DEFENDANTS, with WRAL-5 News and a few other media-types, further implicated MANGUM as responsible for DAYE's death by referencing his death as "stabbing" or his stabbing as "fatal" in their online articles ostensibly for the purpose of shielding Duke University Hospital staff additionally for its responsibility in DAYE's death and shifting blame on MANGUM.

76. Currently MANGUM has served nearly a decade in prison for a crime that was not committed (which is the definition of a trumped-up criminal case); the success of the retaliatory abuse against a single black mother of three by the justice system being possible only with complicity of DEFENDANTS and a rude, insensitive, and cowardly media.

WHEREFORE, considering her absolute innocence in the crime for which she's been convicted, the malicious misconduct by DEFENDANTS and media which has deprived her of due process and enabled furtherance of retaliatory injustices against her by cruel, corrupted, and racist entities and systems, and her continued wrongful confinement approaching nearly a decade, MANGUM respectfully requests of THIS COURT the following relief:

1. DEFENDANTS remove the word "fatally" from the title of their October 7, 2018 online article;

2. DEFENDANTS append to the beginning of their October 7, 2018 online article a corrective passage (with input from MANGUM) that mentions DR. WECHT's report and its implications;

3. DEFENDANTS append to their *Snapped* documentary about MANGUM a written and verbal epilogue about DR. WECHT's report and its implications, again with input from MANGUM;

4. Durham County Superior Court's Criminal Division to produce to MANGUM a copy of the 18-page document under seal that originated from NICHOLS' personnel folder;

5. NC Department of Health and Human Services to produce to MANGUM a copy of the 2014 review by Dr. Deborah Radisch of the NICHOLS' autopsy report;

6. Immediate release from life-threatening state custody with house-arrest being acceptable option as she represents no flight risk;

7. Compensation for damages compensatory, incurred, and punitive; and

8. Other such relief as THIS COURT may deem appropriate.

Submitted this 23rd day of August, 2021.

*Crystal Mangum*
Crystal Gail Mangum # 0801264, Plaintiff Pro Se
Anson Correctional Institution
552 Prison Camp Road
Polkton, NC 28135
No phone or e-mail

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CRYSTAL GAIL MANGUM, | ) | |
| | ) | |
| Plaintiff Pro Se, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| OXYGEN MEDIA, LLC, | ) | |
| and | ) | |
| JENNIFER GEISSER, | ) | |
| Oxygen Media Executive Vice President, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she has filed with the U.S. District Court of the Eastern Division in Raleigh, NC, and had served a copy of the foregoing Libel and Defamation Complaint upon all parties or their attorneys of record by having them served with a Summons and Complaint by the New York City County Sheriff's Office; the Summons and Complaint mailed by Priority Mail to the Sheriff's Office at the address listed below for service ultimately to defendants.

New York City County Sheriff's Office
31 Chambers Street
New York, NY 10007

This the 23rd day of August, 2021.

*Crystal Mangum*
Crystal Gail Mangum # 0801264, Plaintiff Pro Se
Anson Correctional Institution
552 Prison Camp Road
Polkton, NC 28135

No phone or e-mail